0022-3018/80/1682-0111$02.00/0
The Journal of Nervous and Mental Disease
Copyright © 1980 by The Williams & Wilkins Co.

Vol. 168, No. 2
Printed in U.S.A.

# Frontal Lobe System Dysfunction in Some Criminal Actions as Shown in the Narratives Test

ANNELIESE A. PONTIUS, M.D., AND BERNARD S. YUDOWITZ, LL.B., M.D.[1]

The *form* of criminal actions by young adult men was analyzed for evidence of symptoms indicative of dysfunctioning of the frontal lobe system (FLS), which myelinates late. The inability to switch the principle of action (POA) appropriately during an ongoing activity, when intervening circumstances call for such a switch, is one of the most characteristic signs of FLS dysfunction. The other major sign, the inability to plan, is apparently outgrown during childhood. Some criminal persons seem to show such an inability to switch POA, according to our clinical observation. It is hypothesized that there exists a subgroup of criminals who are unable to switch POA within a heirarchy of principles, and that they will be revealed by the already established Trail Making Test B (TMT-B), and by the new brief clinical Narratives Test (NT).

The test results on 30 criminals corroborate the hypothesis. On the Narratives Test, 36 per cent, and on the Trail Making Test-B, 33 per cent of young adult men charged with criminal acts (serving sentences of up to 2 years) demonstrated specifically immature action behavior indicative of FLS dysfunctioning. There is a significant positive association ($\phi = .68$, $p < .001$) between the performance on the two tests.

Probable etiological factors include a developmental lag in the myelinization of the frontal lobes, such as is associated with deprivation of practice in their functions; however, pathology, particularly due to trauma, has yet to be ruled out.

Nauta (17) has emphasized that "the frontal lobe in its entire expanse must be considered association cortex" (p. 167). Thus, the status of myelination of its fiber tracts is particularly relevant. As Flechsig (4) pointed out, the association cortex has not even been completely myelinated by the end of puberty. Yakovlev and Lecours (25) report a steady increase in myelination of the association cortex, particularly the frontal part, at least into puberty and the tapering off asymptotically during old age.

The attainment of frontal lobe system (FLS) functioning (10) comprises two main components, which develop consecutively in childhood, and which were empirically identified through the clinical Narratives Test (NT) (18); these components are designated as stage 3 and stage 4. Stage 3 refers to the ability to form or to maintain a plan of action (18, 23), an ability which is poor only in young children (18, 23) and in brain-lesioned patients. Stage 4 refers to the ability to switch a plan appropriately, *i.e.*, within a hierarchy of ordering principles, under intervening circumstances (18, 23). In adults, such as the present subjects, who show no obvious signs of brain lesions, only a deviation from stage 4 can be expected to exist, and then only in a subgroup.

Essentially the same stages have been revealed independently by Greenfield and Schneider (6), who modified a test (by A. E. Harris) for the ability to build a tangible tree structure. Insofar as these authors are testing for the strategies of construction, this portion of their test is analogous to the NT used herein: both tests are about the ability to organize a task in a hierarchical way and to shift the principle of action— to use interruption strategies, as these authors put it— and ultimately "to sustain a complex sequential task in the face of extraneous interruption" (6, p. 312). All of these latter tasks are associated by neurologists, although not by these authors, with FLS functioning (7, pp. 373–374; 10, pp. 235, 239, 240; 11, p. 13; 24, pp. 333, 410–444).

Greenfield and Schneider's test, like the NT, showed "systematic growth in the representation of hierarchical complexity from age 3 on" (6, p. 299). In the NT, a change toward the interrelated ability to switch the principle of action also began to take place around age 3 and showed a spurt around age 4 (18).

Indications of a positive correlation between an anatomical defect, or at least a relatively deficient myelination of frontal lobe pathways, on the one hand, and specifically deficient action behavior on the other, have already been found in normal children (age 2 to

---

[1] Harvard Medical School. Send reprint requests to Dr. Pontius, Harvard Medical School, McLean Hospital, Institute of Law and Psychiatry, 115 Mill Street, Belmont, Massachusetts 02178.

The authors thank Bernard H. Fox, Ph.D., for help in statistical analysis, and Park Elliott Dietz, M.D., M.P.H., and Paul I. Yakovlev, M.D., for helpful comments.

5). Luria and Homskaya (12) have shown that the normal child is neurologically incapable of switching the principle of action (POA) of an ongoing activity, especially on verbal command, up to 26 months of age for simple tasks, and up to 4 years of age for tasks that involve more than one set of plans to be switched. Also, results from the NT (18) reflect a positive correlation, similar to the developmental profile just cited (12), between the level of the form of action as revealed in invented stories and the anatomically known low level of FLS myelination, particularly prior to its spurt around age 4.

In an analysis of the form of action behavior revealed in unstructured clinical interviews of a large subgroup of children suffering from minimal brain dysfunction (MBD), clinical indications for the same relationship between development and form of action were found still to persist to some extent in such children (19, 20, 22) beyond 4 years of age. Meanwhile, objective support for the presence of frontal lobe dysfunctioning playing a role in MBD has come from a study using auditory evoked potentials (26).

A subgroup of youths (ages 9 to 16) who had been charged with indictable acts was also experimentally identified (23) among control groups through the NT as showing specific FLS dysfunctioning. Further support of these findings has come from EEG studies of repetitively assaultive adolescents. Krynicki (8) found that "paroxysmal activity, particularly in the frontal area, appeared to be the most important EEG feature related to assaultive behavior" (p. 59).

Lewis (9) reported recent findings calling for a modification of her previous results from a study of children with only minor delinquencies. Differentiating these from her seriously delinquent children, she found in medical records that the incarcerated, seriously delinquent ones sustained more perinatal difficulties and accidental head and face injuries than had nonincarcerated delinquents. She finds it very likely that this group was physically abused and/or neglected (p. 26).

Milner (13, 14) found frontal leucotomy patients to be particularly deficient in the Wisconsin Card Sorting Task (5). These patients are unable to identify and to follow the changing ordering systems required by this test, and maintain instead their original strategy of card sorting. Milner does not attribute this inability primarily to "a disturbance of abstract thinking" (13, p. 98), for these patients, while continuing their wrong strategy, make spontaneous comments which reveal that they *know* that a new ordering principle has been introduced. She emphasizes that this finding reveals "a curious disassociation between the ability to verbalize the requirements of the test and the ability to use this verbalization...as a guide to action" (14, pp. 322–323).

Luria and Homskaya (12, p. 359) identified analogous behavior when asking FL patients to draw a sequence of simple figures, *e.g.*, "a cross, two circles, and a triangle." They found a deficit in matching of action with original intention, and a derailment of programmed behavior which is not compelled by the observer's, nor even by the patient's own, verbalization of the required steps.

Milner (14) gave the Stylus-Maze-Test, a tracing task, to FL patients and found them unable to comply reliably with the rules of the game. These patients took illegal shortcuts and were "unable to restrain themselves from moving the stylus diagonally...or rushing ahead toward the goal, despite the repeated clicking of the error counter" (14, p. 326). Again, as in the card-sorting tests, these FL patients appear aware of their mistakes, in the sense that they can verbalize them, but they are unable to change their POA accordingly.

Thus, Nauta (17, p. 171) characterizes the frontal lobe (FL) disorder as a "derangement of behavioral programming," whereby persons are unable to maintain a normal "stability-in-time." Their "action programs, once started, are likely to fade out, to stagnate in reiteration or to become deflected away from the intended goal." Nauta has suggested that there exists "an inadequate 'internalization' of all those error- or error-approach-signals, including even self-directed verbal commands, that normally modulate the evolvement of behavioral programs."

According to our clinical observation, some criminal persons seem to show the inability to switch POA. In such cases an initially antisocial plan is liable to disintegrate into even less socialized action behavior than was originally conceived.

### Hypothesis

It is hypothesized that there exists a previously unidentified subgroup among young adult criminals convicted for acts that through their very complexity reveal no signs of any functional or organic psychosis or of any previously identified organic state (especially those characterized by signs of severe impairment of judgment or impulse control).

Specifically, it is hypothesized that such a subgroup will reveal, through testing, an inability to switch appropriately the POA within a hierarchy of principles when intervening circumstances would demand such switching. This hypothesis stems from clinical observations gleaned by us from our work in forensic psychiatry and from the known neuroanatomical facts of the protracted process of FLS myelinization (4, 25).

The hypothesis does not place a heavy accent on social, familial, or ego psychological factors, although all such factors may play a role in fostering or inhibiting frontal lobe functioning, as discussed previously (23).

### Subjects

The population for this study consists of 30 physically healthy men (mean age = 22.8 years) convicted of criminal acts for which they were serving a prison sentence not longer than 2 years. (Three other subjects were later eliminated because the judges could not agree on their NT behavior; see "Results.") They were prevailingly from a lower (to middle) socioeconomic level. All but two of the subjects were white. All consecutive referrals for medical services up to the total number of 30 made up the sample, with the exception of the following: those who at the time of their criminal activity had been under the influence of drugs, including alcohol intoxication, or who showed signs of psychosis, mental retardation, organic brain syndrome, or episodic dyscontrol (15, 16). At the time of testing none of those conditions was observed, nor were any antipsychotic medications received by the subjects.

Men who spontaneously asked for a medical interview (about 50 to 60 minutes duration) had either minor medical problems that mostly interfered with their sleep, or they requested minor tranquilizers. These men sought medical help usually because of the stress associated with imprisonment, but in most cases they just wanted to talk to a psychiatrist. Thus, if at all, the medical referral status of the population can be considered as having biased the sampling in disfavor of our hypothesis, inasmuch as those men who initiated such a referral could be considered to have been more flexible, with higher frontal lobe maturity, than others not in the sample.

As a comment on the truthfulness of the subjects' reports on their actions, it is of note that this is part of their available criminal record, at least in the most salient aspects of the circumstances under which they were apprehended, aspects that are particularly weighty as criteria for the present rating. Moreover, almost all of the subjects were already sentenced, so that lying would have no legal impact. More importantly, it appears less likely that lying played an essential role in their reports on their action behavior, for the majority of those subjects whose test performance led to a low rating on FLS functioning (and who thereby support our hypothesis) spontaneously rated their own behavior (at least retrospectively, if not at the time of its occurrence) as "stupid," "making no sense," and the like, as it was characteristically puzzling to them.

The special and naturalistic circumstances of these men's testable action behavior precluded the availability of appropriate controls who had performed actions under reasonably comparable circumstances. Therefore, an attempt was made to use the subjects as their own controls, comparing past and present actual criminal action behavior in a subsample of the same subjects. Further, the subjects served as their own controls in two different tests (Table 1).

### Procedures

The present study focuses on tasks and techniques that previously have been proved statistically successful in identifying children and adolescents (18, 23) who show an inability to switch appropriately the POA of an ongoing activity—an inability considered specific for FLS dysfunctioning (17, 24). The two tests used here are designed to detect such an inability to switch: a) the Trail Making Test B (TMT-B) (1); and b) the Narratives Test (NT) (18, 23).

The procedure was as follows:

1. One experimenter (A. A. P.) selected subjects at random, up to a total of 30 subjects, as they presented themselves during the experimenter's clinical work in forensic psychiatry. (This group excludes the three men on whose NT results the judges disagreed.) Each man was given two tests:

a) The TMT-B was given, in which the number of errors was rated after subjects had been given a demonstration of two moves. Time was not measured, inasmuch as it is not an essential factor for the determination of the ability to switch POA, here under discussion.

b) The clinical NT was given by recording verbatim reports on the subjects' *actual* criminal actions leading to their incarceration. Then a number was assigned to their stories, which were rated (see "Discussion") as to whether or not the *form* of action behavior revealed the ability to switch POA during an ongoing activity in a way appropriate to intervening circumstances, as previous (18, 23) and present samples demonstrate.

c) A nonselected subsample of seven subjects was asked about their actions that had led to prior charges. They reported such prior actions that had also led to arrest. Because all seven of these subjects obtained the same ratings by both judges in both reports on their past and present actions, additional men were not asked to report on such previous activities, especially because they tended to become suspicious about such questioning.

d) A test-retest situation was also applied to the

same subsample of seven after a 3-month interval. Since in all but one case the outcome showed agreement between the two tests, the retest was discontinued as showing no significant difference from the main sample. Also, the men tended to become reticent about being asked to repeat themselves.[2]

2. The second experimenter (B. S. Y.) received the stories identified only by number, and rated them as a blind judge according to the same criteria described under part 1.

### Results

The results are shown in Table 1. For the NT the hypothesis is confirmed in a subgroup of 11 (36 per cent) of the sample of 30 young adults convicted of crimes for which they were sentenced for up to 2 years duration. Their NT performance indicates that they were unable to switch the principle of an ongoing activity appropriately when intervening circumstances demanded it.

These results of the NT are supported in a comparison with the results of the already established TMT-B, in which only two subjects (10.5 per cent) of the 19 able to switch POA on the NT made only one error, whereas eight (72 per cent) of the 11 who were unable to switch POA on the NT had one or more errors on the TMT-B (four of the unable subjects had one error, one subject had two errors, and three subjects had more than two errors). Independence of the two sets of test results from each other was tested by Fisher's Exact Test and was highly significant ($p < .001$). The correlation between the two tests was derived from the 4-fold table by calculating the $\phi$ coefficient: $\phi = \sqrt{\chi^2/N}$. Its value, .68, was also significant at $p < .001$ for $N = 30$.

As to the correlation between the ratings of the two judges, they did not agree with one another in three instances in which one judge rated an action as impulsive whereas the other rated it as an inability to switch POA. Such a discrepancy in the rating is of theoretical importance, since it involves the not yet settled questions about the participation in action behavior of limbic system (LS) structures. It is known that the LS has connections to the FLS, which controls the limbic input before it is translated into action behavior. It is at this level that it is difficult, if not in some instances impossible, to decide how much a particular action behavior is attributable to LS or to FLS. Since this problem has not been settled in neurophysiological and neuropsychological research, the three instances in which the ratings by the two judges did not agree had to be eliminated from the sample as not yet ratable.

TABLE 1
*Relationship between NT and TMT-B Scores*

Fisher's exact probability test shows a highly significant association ($p < .001$) between the performances on two tests: ability to switch the POA appropriately during an ongoing activity on the established TMT-B and on the new NT.

|  | NT | |
| --- | --- | --- |
|  | Able to Switch | Unable to Switch |
| TMT-B |  |  |
| Error-free | 17 | 3 |
| Error(s) | 2 | 8 |

### Summary of Observed Specific Kinds of Criminal Actions

In all but these three undecided instances (where the two judges disagreed), the relationship between limitations in switching POA and a specific kind of criminal activity is shown in the observation that the plan of action deteriorates, is less under the ordering of the FLS, so that a developmentally early form of action ensues that is less integrated with the various factors fostering social interaction. Thus the subjects' initial plan of criminal activity is likely to become increasingly destructive, involving persons or property. This lowering of FLS mediation can be seen in a specific kind of violent or destructive behavior that is qualitatively different from the impulsive (limbic system mediated?) type, where an initially present strong emotional component catapults the person into action. By contrast, here under discussion is a kind of violent or destructive behavior that is secondary to a lowering of FLS mediation. This second kind of criminal action can be differentiated by a qualitative analysis, which shows that the actions were initially planned to be of a nonviolent, nondestructive kind (as usually also revealed by these persons' prior criminal history). It is only when some intervening circumstance occurs that their action deteriorates into destructiveness or violence without the presence of a corresponding emotional component directed at the person or property to be violated by the criminal action. There might merely be some feelings of frustration or annoyance in face of the interfering event. Moreover, during each deteriorated behavior, the persons—either during it or very soon afterwards—are aware of the inappropriateness of their action but cannot reprogram it within a hierarchy of POA.

---

[2] The confidentiality of each man was strictly observed, as no name appeared on any story, and revealing aspects (such as locality names) were changed without interfering with the form of action to be tested. As a general procedure, all subjects were routinely informed that the experimenter was a psychiatrist, that they were not required to answer any questions, and that the information was not strictly confidential. After such routine warning, each subject agreed to proceed.

Inability to switch POA could be called "perseveration of POA." This is specific for FLS dysfunction. It differs from the use of the term "perseveration" to refer to repetition of a concrete unit of action, which is a sign of general brain dysfunction.

### Examples of Action

*Unable to Switch POA (Note emphases)*

1. I got busted for armed assault and robbery, house invasion, and auto theft. I got into the house from the back door *to look for money.* There seemed to be nobody in. *Suddenly I see this old man inside. I tied the old man up and gagged him and put him in a closet and looked for the money.* I got it and left in a stolen car. Somehow the old man got to the phone and called the police, and then he identified me. That's how I got into armed assault for the first time in my life. When nobody is in, I only steal things.

2. I was *shoplifting, a cop came* and asked me questions, and *I threw the cop to the ground.* It was stupid, I got charged with A and B [assault and battery] of a cop.

*Able to Switch POA (Note emphases)*

3. The charge is armed robbery. I was in a friend's apartment. This girl was there with her boyfriend. She said "I need a couple of bucks." I was broke, so I said, "I'll get you a couple of bucks," and I left with a kitchen knife from the apartment. I thought what store to go to. *A lady came in the store. I waited for her to clear the store.* I was not nervous. I said to the guy cashier, "Be cool, put the money in the bag," and I showed him the knife, and I told him to open up the safe, and he gave me the money. I hid the money some place. When I walked out of the store *I said, "OK, Tom, I'm going to make the deposit,"* [acting as if he worked there and had to take the money out]. I went to my own apartment. The cashier called the police and identified me.

4. They charged me with armed robbery, I was an accessory. Two friends did it. They came around the corner running; I was 60 feet ahead of them; and I just started running too, because I was only out for 1 month on drug charges. We all went different ways. *Two cops ran after us,* one guy got away, one cop came after me. *I just stopped running.* First, I ran on instinct, then I thought to myself, "I really didn't do it." The man who was robbed in the street said I did it. My mother said, "Look at it as a balance of the scales of life. You got away for some other things."

Note that in examples 1 and 2 there is an inability to switch appropriately (*i.e.*, to a higher level within a hierarchy of action principles) an ongoing action under intervening circumstances: In both examples, it is inappropriate to add assault to the crime in progress in order to continue the POA by trying to eliminate the intervening circumstance: the unexpected presence of the owner or the appearance of the policeman, respectively. The escalation of the offense is not a "switch" in the POA, which continues, but rather a temporary change in a concrete unit of action. By adding assault, these men engaged in behavior at a less socialized level than planned.

By contrast, examples 3 and 4 show an appropriate ability to switch during an ongoing action when a surprising situation occurs.

### Discussion

The present delineation of a subgroup of criminal persons showing signs of FLS dysfunctioning stands, whether or not the accent of specific FLS functioning is viewed as being mainly related to action behavior (17, 24) or to "socialization"[3] where the accent is on the social context of action.

The more complex the social interaction is, the more it demands an ability to switch appropriately the principle of an ongoing action, such as to switch from committing a serious criminal act to a less harmful one or even to a noncriminal one.

When a burglar is interrupted by the sudden appearance of the apartment owner, we find the following hierarchy of the burglar's potential reactions, mediated through a reciprocal relationship between FLS and LS:

1. The least socialized reaction and the greatest inability to switch the POA appropriately would be revealed by starting a fight with the owner.

Depending on the details of the form of the actions, such a fight would essentially constitute either a) a dysfunctioning or lack of functioning of the FLS; or b) a prevalence of LS involvement. Thus, a) a fight could represent a continuation of a particular initial POA, *e.g.*, continuing with the burglary and thereby eliminating in an inappropriate (unsocialized) manner any intervening factors, such as an owner's presence. Alternatively, b) a fight could also constitute an upsurge of a global rage at the interference, leading to a disintegration of the very principle of action itself.

2. Somewhat more socialization would be shown by fleeing. In analogy to 1, here too both anatomical systems (FLS and LS) can be involved: a) The flight could represent an appropriate switching of POA (FLS functioning) under the impact of a sudden intervention by the owner, thereby merely preventing an inappropriate drop of the POA to an even lower (developmentally earlier) level of socialization, such as harming the owner. b) On the other hand, the flight could represent a global all-pervasive fear with poorly planned action with LS prevalence (*e.g.*, in one case,

---

[3] Geschwind, N. Lecture on Frontal Lobe System. Harvard Medical School, Boston, 1978.

eliminated from our sample for already stated reasons, the flight led to jumping into an icy river).

3. The most complex socialized act would also show the greatest ability to switch POA in an even more appropriate way, even though it is occurring within the sociopathic context under study. Thus a burglar, when surprised in his act, could not merely refrain from stealing, but could also act as if he had gotten into the apartment through error, and he could then leave in a non-destructive, controlled fashion (high level FLS functioning).

Viewed as a reciprocal hierarchy, the more efficient the FLS participation, the more appropriate the action behavior within the context of the overall action level, even though this may involve a sociopathic plan, as with our subjects. In other words, the less prevalent the LS involvement, and the more prevalent the FLS functioning, the better for the safety of all participants.

## Practical Implications

In forensic psychiatry one of the main unanswered questions is what etiological factors contribute to delinquent acts and to what extent. The problem has been stated succinctly—though we believe in a prematurely pessimistic way—most recently by Byles (2) when he suggested that the medical model may not be applicable to most forms of juvenile delinquency since "there is mounting evidence that delinquency is not an illness." Byles therefore believes that "early intervention . . . can be disastrous for the child believed in need of help" (p. 13).

If, however, *specific* neurological dysfunctioning can be delineated either as being associated with a pathological state or with a neurodevelopmental lag, which the previous (23) and present results strongly suggest to be the case for subgroups of juvenile and young adult delinquents, then the medical model will be applicable. Traumatic factors, both physical and psychological ones, may also play a role, as recent findings by Lewis (9) suggest. The possible role of psychological trauma has previously been discussed (20) in reference to research with rats, where depletion of neurotransmitters in the FLS was observed after repeated defeats of the animals (3).

Once a specific neurological system has been implicated through test results, then further specific test situations can be used, and remedial exercises can be developed. First, of course, it is important to flesh out the skeleton of the present preliminary findings, which extend a new conceptual approach to new areas. The usual standardization process must be followed: determination of large sample reliability of the NT, reliability of the criterion judgments, validity of the NT, distribution characteristics among NT test responses, and all the other needful things.

When the test is deemed good enough, and if indeed the FLS is implicated, then further specific test situations can be used, and remedial exercises can be developed, *e.g.*, the TMT-B itself, "outward bound" types of experiences, practice with complex patterns, and perhaps mazelike pathways, such as those in Nazca (Peru) (21). One wonders whether such practice in prehistoric youth could profitably be compared with the tendency of our present-day youngsters to view passively such actions on TV with no need to re-visualize, retell, rewrite, rethink, or reenact (*e.g.*, through play).

## References

1. Armitage, S. G. An analysis of certain psychological tests for the evaluation of brain injury. Psychol. Monogr., Vol. 60, No. 1 (whole no. 277), 1946.
2. Byles, J. A. Psychiatry said to be useless in delinquency problems. (Report on annual meeting of the Canadian Psychiatric Association). Psychiatric News: *12*: 13, 1977.
3. Eleftheriou, B. E., and Boehlke, K. W. Brain MAO in mice after exposure to aggression and defeat. Science, *155*: 1693–1694, 1967.
4. Flechsig, P. Anatomie des menschlichen Gehirns und Rueckenmarks auf myelogenetischer Grundlage (*Anatomy of the Human Brain and Spinal Cord, Based on Myelogenesis*), Vol. 1, pp. 14, 22, 35–36. Georg Thieme, Leipzig, 1920.
5. Grant, D. A., and Berg, E. A. A behavioral analysis of degree of reinforcement and ease of shifting to new responses in a Weigl-type card-sorting problem. J. Exper. Psychol., *38*: 404–411, 1948.
6. Greenfield, P. M., and Schneider, L. Building a tree structure: The development of hierarchical complexity and interrupted strategies in children's construction activity. Dev. Psychol., *13*: 299–313, 1977.
7. Hécaen, H. H., and Albert, M. *Human Neuropsychology*. John Wiley, & Sons, New York, 1978.
8. Krynicki, V. E. Cerebral dysfunction in repetitively assaultive adolescents. J. Nerv. Ment. Dis., *166*: 59–67, 1978.
9. Lewis, D. O. Delinquents said to have perinatal injuries. (Report on meeting of the American Society for Adolescent Psychiatry). Psychiatric News, *13*: 26–28, 1978.
10. Luria, A. R. *Higher Cortical Functions in Man*. Basic Books, New York, 1966.
11. Luria, A. R. Neuropsychology in the local diagnosis of brain damage. In Smith, W. L., and Philippus, M. J., Eds., *Neuropsychological Testing in Organic Brain Dysfunction*, pp. 5–21. Charles C Thomas, Springfield, Ill., 1969.
12. Luria, A. R., and Homskaya, E. D. Disturbance in the regulative role of speech with frontal lobe lesions. In Warren, J. M., and Akert, K., Eds., *The Frontal Granular Cortex and Behavior*, pp. 353–371. McGraw-Hill, New York, 1964.
13. Milner, B. Effects of different brain lesions on card sorting. The role of the frontal lobes. Arch. Neurol., *9*: 90–100, 1963.
14. Milner, B. Some effects of frontal lobectomy in man. In Warren, J. M., and Akert, K., Eds., *The Frontal Granular Cortex and Behavior*, pp. 313–334. McGraw-Hill, New York, 1964.
15. Mark, V. H., and Ervin, F. R. *Violence and the Brain*. Harper & Row, New York, 1970.
16. Monroe, R. R. *Episodic Behavioral Disorders—A Psychodynamic and Neurophysiologic Analysis*. Harvard University Press, Cambridge, Mass., 1970.
17. Nauta, W. J. H. The problem of the frontal lobes—A re-interpretation. J. Psychiatr. Res., *8*: 167–187, 1971.

18. Pontius, A. A. Basis for a neurological test of frontal lobe function in adolescents. Adolescence, *9:* 221–232, 1974.
19. Pontius, A. A. Discussion of conceptual models of minimal brain dysfunction. Proceedings of Minimal Brain Dysfunction Conference, 1972. Ann. N.Y. Acad. Sci., *205:* 61–63, 1973.
20. Pontius, A. A. Dysfunction patterns analogous to frontal lobe system and caudate nucleus syndromes in some groups of minimal brain dysfunction. J. Am. Med. Women's Assoc., *28:* 285–292, 1973.
21. Pontius, A. A. Nazca's prehistoric fostering of frontal lobe functions. Proceedings of the Second Vienna International Meeting on Human Ecology, 1977, pp. 135–143. Archivum Oecologiae Hominis, Vienna, 1978.
22. Pontius, A. A. Neurological aspects in some typé of delinquency, especially among juveniles. Toward a neurological model of ethical action. Adolescence, *7:* 289–308, 1972.
23. Pontius, A. A., and Ruttiger, K. F. Frontal lobe system maturational lag in juvenile delinquents shown in narratives test. Adolescence, *11:* 509–518, 1976.
24. Teuber, H. L. The riddle of frontal lobe function in man. In Warren, J. M., and Akert, K., Eds., *The Frontal Granular Cortex and Behavior*, pp. 333, 410–444. McGraw-Hill, New York, 1964.
25. Yakovlev, P. I., and Lecours, A. R. The myelogenetic cycles of regional maturation of the brain. In Minkowski, A., Ed., *Regional Development of the Brain in Early Life*, pp. 3–70. Blackwell, Oxford, 1967.
26. Zambelli, A. J., Stamm, J. F., Maitinksy, S., and Loiselle, D. L. Auditory evoked potentials and selective attention in formerly hyperactive adolescent boys. Am. J. Psychiatry, *134:* 742–747, 1977.