```
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                              )
         v.                   )   Cr. No. 07-10283 RGS
                              )
TIMOTHY SILVIA,               )
   Defendant.                 )
                              )
```

SENTENCING MEMORANDUM OF THE UNITED STATES

The Presentence Report prepared by the United States Probation Office, dated June 10, 2009 (the "PSR"), properly concludes that the defendant is a career offender, and calculates the defendant's guideline sentencing range as 262-327 months, based on a Total Offense level of 34 and a Criminal History Category ("CHC") of VI.  PSR ¶ 189.  The PSR also correctly notes that the defendant is subject to a 10-year, statutory mandatory minimum sentence because the offense involved over 5 kilograms of cocaine.  Id. ¶ 188.  The government recommends that the Court sentence the defendant to a term of incarceration of 262 months, representing the low end of the guideline range, to be followed by a term of supervised release of 5 years.

    A.    **THE DEFENDANT'S CRIMINAL HISTORY**

For the past 29 years, the defendant has been a one man crime spree.  The defendant has 238 entries on his Massachusetts Board of Probation criminal history record.  The defendant has amassed 35 criminal history points (approximately three times the amount necessary to place him in CHC VI).  PSR ¶ 129.  The defendant's numerous convictions include four scoreable career

offender predicates, and numerous additional career offender predicates that would be scoreable but for the fact that they occurred outside the requisite time frame.

The defendant's career offender predicates involve serious violent offenses, often against women. For example, in 2003 he was convicted of assault and battery with a dangerous weapon after he beat a woman with a pool stick. PSR ¶ 125. He was sentenced to 3 years in state prison. Id. He had just gotten out of prison, and was on probation in that case, when he committed the offenses in this case.

In 1996, he was convicted of assault with a dangerous weapon, assault and battery, threats, discharging a firearm within 500 feet of a building, attempted murder, and armed assault with intent to murder, and sentenced to 4 years to 4 ½ years in state prison. PSR ¶ 121. That case involved the defendant assaulting a woman with a gun and a knife, and assaulting and beating the same woman. Id.

In 1996, he was convicted of escape after he and other inmates fled after jumping from the van transporting them from prison to court. Id. ¶ 122. In 1988, he was convicted of assault and battery with a dangerous weapon and assault and battery. Id. ¶ 101. He was sentenced to 2 years in prison, which was imposed in 1994 when he violated the terms of his probation. Id.

The defendant also has numerous other convictions for serious crimes of violence which would be career offender predicates if not for the fact they took place outside the requisite time frame.[1]  For illustrative purposes, a selection of these are highlighted below.

In 1988 (at the age of 20), the defendant was convicted of robbery, kidnaping, and two counts of assault with a dangerous weapon.  PSR ¶ 92.  He was sentenced to 8 years in state prison, with 4 to serve and 4 suspended, and was in prison until 1991.  Id.

In 1993, he was convicted of assault and battery, and served approximately 26 months in custody after violating his probation.  PSR ¶ 114.  This case involved the defendant beating a limousine driver who had given the defendant's former girlfriend (who had a restraining order out against the defendant) a ride, and threatening to shoot him and burn his car.  Id.

The defendant's additional serious convictions include the following:  assault & battery, assault with a dangerous weapon, escape after arrest (1994) (PSR ¶ 115); assault & battery with a dangerous weapon, assault & battery, and driving to endanger

---

[1] It appears that the only reason so many of his career offender predicates are outside the pertinent time frame is because the defendant spent much of the past 15 years in jail.

(1994 – 6 months house of corrections) (PSR ¶ 116);[2] assault & battery, violation of protective order, threatening to commit a crime (1994) (PSR ¶ 117);[3] violation of a protective order, intimidation of a witness, and stalking (1994) (PSR ¶ 118); assault & battery (1996 – 1 year HOC) (PSR ¶ 120); assault & battery (1993) (PSR ¶ 113); breaking and entering in nighttime to commit a felony (1989 – 1 year HOC) (PSR ¶ 103); and assault & battery (1988) (PSR ¶ 94).

The defendant has a plethora of additional adult and juvenile convictions. His convictions and other arrests show a steady and consistent pattern from 1974 to the present. PSR ¶¶ 74-125. The defendant was in prison from October 2003 to September 2006, was on probation when he committed the offenses in this case, and had been out of prison for less than a year. PSR ¶¶ 127-28.

It appears that the only time that the defendant has not been committing crimes against the public at large -- many of

---

[2] This case involved the defendant repeatedly punching a woman in the face, and then backing his vehicle into a witness knocking the witness down. Id.

[3] This case involved the defendant assaulting Maria Duarte, a former girlfriend who was the victim of many of his assaults. The defendant came to Ms. Duarte's house (she had an active protective order against him), and when she let him in the house: "The defendant then hit her in the head, bit her on the forehead, and threatened to kill her." According to the police report, "Officers observed a bruise on the right side of the victim's head and a bite mark above her right eye." PSR ¶ 117.

them violent crimes and many against women -- is when he has been in prison. The defendant has spent much of his adult life in prison and it has not deterred him from committing further crimes (indeed, he finished a 3-year sentence less than a year prior to his crimes in this case). Cf. United States v. Smith, 2007 WL 2947502, *7 (6th Cir. 2007) (imposing above guidelines sentence where it was obvious that prior incarceration "was obviously not sufficient to comply with the purposes of § 3553(a)(2)"). The defendant is the definition of a career offender. A sentence at the low end of the guideline range is necessary and appropriate to specifically deter this defendant from committing violent crimes and to protect the public from this defendant.[4]

---

[4] The defendant has also committed violent crimes while in prison. For example, in August 1996, he was disciplined arising from an incident at Plymouth County Correctional Facility. Correctional officers reported to a disturbance in a cell. When they arrived they saw inmate St. Peter kneeling on the floor holding his bleeding head. The defendant, who was out of breath and packing his property, said "I told you I couldn't live in a five man unit." He then told the officers, "Put me in a five man room again, and next time I'll kill someone." D.R. Reports are attached as Exhibit 1, including a recent one in which the defendant threatened a correctional officer by saying: "This is your small world. I live in a big world out on the streets, and I'll see you some day." Another set of reports indicates that the defendant purposefully stopped taking his medications to try to force the institution to transfer him to another facility.

B. **THE OFFENSE CONDUCT AND BACKGROUND IN THIS CASE**

The PSR adequately describes the offense conduct and pertinent background in this case. PSR ¶¶ 11-54. The government notes a few items of particular significance.

First, the defendant has long been known to law enforcement as well respected and former leader of the Brockton Chapter of the Outlaws Motorcycle Club, an international motorcycle club with a long history of violence, intimidation, and drug and firearm trafficking. PSR ¶ 18. See generally United States v. Bowman, 302 F.3d 1228, 1231 (11th Cir.2002); Detention Affidavit of FBI SA Timothy Quinn (Dkt. #2).

The defendant corroborated his role in the Outlaws, and as a significant criminal figure, when he stated on tape during the May 23, 2007 meeting that "I was the boss out here." PSR ¶ 31. Similarly, the defendant described his reaction when he recently got out of jail and Joseph Noe, the President of the Taunton Chapter, "tried to hit me some Tony Soprano shit":

> This is my area! He's trying to tell me that I can't do nothing anywhere unless I talk to him. . . . I'm sitting in the fuckin bar (unintelligible) . . . he was with some girls. I said I'll slap you right off your fuckin bar stool you little punk! I made you and I'll break you! So he didn't like that. He's like no, no, no, it don't go like that. I said listen I'm gonna tell you right now -- it goes like that I am the fuckin -- I am this area not you! . . . . The only thing you can do in this area is suck my cock in front of these girls you little weasel!

The defendant also has two tattoos that state "Outlaws".

6

Second, in the recorded conversations, the defendant demonstrated that he is an experienced and enthusiastic, large-scale drug dealer, who wanted to do 8-10 deals of approximately 10 kilograms of cocaine each. PSR ¶ 36. The first meeting between the undercover agents (the "UCs") and the defendant, on May 23, 2007, was arranged so that the defendant could sell the UCs some vehicles. During this meeting, it was the defendant who first raised the question of buying large amounts of drugs. First he asked, "You guys truck and, ah, fucking pounds of marijuana?" Later when he was asked "weed or what are you looking for?", he replied "cocaine", and said that he wanted at least ten kilos. PSR ¶ 31. He also expressed his enthusiasm for doing big deals, stating "I'm always game, seriously. My money is always there." Id.[5]

Third, defendant and his co-defendant Todd Donofrio brought approximately $55,000 to the July 30, 2007 deal, and after providing the money to the UCs, the defendant got into the back of the truck and was handed 5 kilograms of cocaine, which he and Donofrio were going to take with them, and was shown the

---

[5] He also demonstrated his experience and savvy as a large scale drug dealer, repeatedly stating that he wanted "to look at a couple of [the kilos] before I fucking pay the bill." PSR ¶ 36. He also talked about how he mixes cocaine with cutting agents to make kilos, stating that he is a "chemist" and "I kill them. I cut them one for one." [I.e., he takes a kilo of cocaine and a kilo of mixing agent and mixes them "one for one" to make two kilos.]

additional 5 kilograms that they were going to come back and get after selling the first 5 kilograms. PSR ¶ 51.

Fourth, the defendant's statements, on audio and video tape, during the discussions leading to the coke deal, are perfectly consistent with, and further evidence of, his extremely violent history and nature. The defendant's recorded statements include the following.

-- "I already got 20 years in there. I'm fucking shooting it out with them. I ain't fucking (UI) hell with them mother fuckers. Fuck that. I'm going out in a blaze of glory. I'm not going out going to jail. I can't do 20 more years." PSR ¶ 36.

-- "I like going to the bar and listening to a guy telling me how he's got fucking 200,000 at his house and I'm gonna go in there rob his punk ass. That's what I used to do. That was my (UI). . . . Yeah, I used to take down like a lot of these punk drug dealers. . . . Me and my friend robbed this dealer one time of ten kilos out of, ah, this fucking homo. The kid was a homo. We got house invasion, armed robbery, kidnaping, all kinds of charges. We took it to trial and beat it. We beat it. Got ten kilos and like fucking 90 grand in cash." PSR ¶ 36.

### C. THE DEFENDANT'S MEDICAL REPORT

The defendant does not contest the PSR's calculation of the applicable guideline range as 262-327 months. Nor does he contest or challenge his extensive and violent criminal history.

Rather, the defendant relies, essentially exclusively, on the report of a forensic psychiatrist, Dr. Bernard Yudowitz (the "Yudowitz Report"), in arguing for a deviation from the guidelines.

Dr. Yudowitz apparently met with the defendant on one occasion, and reviewed his elementary school records and some medical reports.  See Yudowitz Report at 1.  Dr. Yudowitz conducted no medical examination of the defendant, and ordered no CAT Scan, MRI, or other tests or examinations of the defendant's brain.

Nevertheless, in what is essentially a page and a half report, Dr. Yudowitz makes some tentative diagnoses of the defendant.  Thus, for example, the report opines that "Mr. Silvia's early history indicates that he *most likely* was neurologically damaged at birth."  Yudowitz Report at 2.  Having indicated this possibility, he later adopts it as a given, opining:  "Having been born with compromised brain circuitry, Mr. Silvia's brain suffered further trauma" during fights and motor vehicle accidents.  Id.  At the end, Dr. Yudowitz returns to the speculative, opining that the defendant "*most likely* began his life with minimal brain dysfunction which was not able to improve as a result of his violent and tumultuous childhood."  Id. at 3.  Dr. Yudowitz also notes that "new developments . . . have recently shown *to be very helpful* in cases such as Mr. Silvia's.

9

. . . and it *quite possible* that with proper treatment he could develop better controls over his behavior." Id.

The burden is on the defendant to show, by a preponderance of the evidence, that there is a valid basis for a departure. The Yudowitz Report does not come close to meeting this standard. The Yudowitz Report is based on a single interview with the defendant and a review of some records.  Dr. Yudowitz did not order or review a Cat Scan or MRI of the defendant's brain and did not conduct or order any other types of exams.

At the end of the day, the Yudowitz Report indicates that the defendant might have neurological problems that contribute to his antisocial behavior and there might be new treatments that might help him better control his violent impulses.  At most, the report speculates about possible causes for the defendant's violent history and speculates about what might help him.  Given the extremely limited nature of Dr. Yudowitz's involvement with the defendant, and the lack of any CAT Scan, MRI, or other testing, it is unclear how he could possibly offer anything but speculation.  Cf. United States v. Utlaut, 497 F.3d 893 (8th Cir. 2007)(rejecting request for diminished capacity departure deviation where, among other things, records and affidavit submitted in support lacked careful analysis regarding the link between the defendant's condition and his offenses and were "conclusory").  See also United States v. Rivera-Quiles, 2006 WL

2071 (D.P.R. 2006) (a downward departure for a "significantly reduced mental capacity" under U.S.S.G. § 5K2.13 is established "by a specific showing that said mental condition impaired defendant's ability to understand the wrongfulness of his behavior or his ability to control behavior he knew was wrong").[6]

The defendant is extremely violent and has been extremely violent for the last 30 years. The defendant should be examined in prison and he should receive any appropriate treatment that might help him curb his violent impulses. Based on the defendant's long history of violent crimes, particularly crimes against women, his leadership role in a violent motorcycle gang, his involvement in a large scale drug deal, and his violent threats and statements on tape, however, the Court's primary concern at this point should be protecting the public from further violent crimes of the defendant, and specifically deterring the defendant from committing further crimes against

---

[6] Among other things, there is no indication that Dr. Yudowitz made any effort to consider the facts of the defendant's prior offenses (which include beatings, assaults, robberies, and other crimes of violence) or to review the numerous tapes in this case which showed the defendant to be an active and enthusiastic cocaine trafficker. Cf. United States v. Robles-Torres, 109 F.3d 83, 87n.4 (1st Cir.1999) (acknowledging appropriateness of district court's refusal to grant diminished capacity departure where "the tape recordings adequately evinced [defendant's] grasp of ongoing events at the critical times").

11

the public at large.  A sentence at the low end of the guideline range is necessary and appropriate to serve these goals.  <u>Cf.</u> U.S.S.G. §5K2.13 (departure unavailable where, as here, "the defendant's criminal history indicates a need to incarcerate the defendant to protect the public").[7]

## CONCLUSION

For the foregoing reasons, and those set forth in the PSR, the government recommends that the Court sentence the defendant to a term of incarceration of 262 months to be followed by a term of supervised release of 5 years.

```
                                Respectfully submitted,

                                MICHAEL J. SULLIVAN
                                United States Attorney,


                          By:   /S/ PETER K. LEVITT
                                PETER K. LEVITT
                                Assistant U.S. Attorney
                                One Courthouse Way
                                Boston, MA 02210
                                (617)748-3355
```

August 21, 2009

---

[7] Post-<u>Booker</u>, of course, the Court is not bound by the guidelines in making the deviation determination.  But the same considerations that informed §5K2.13 (i.e., the need to protect the public from that category of truly violent offenders, should also inform the decision under 18 U.S.C. § 3553.

CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                        /s/ PETER K. LEVITT
                                        PETER K. LEVITT
                                        Assistant United States Attorney

August 21, 2009