```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2

 3    * * * * * * * * * * * * * *
      *UNITED STATES OF AMERICA   *
 4                                *   CRIMINAL ACTION
              v.                  *   No. 07-10283-RGS-1
 5    *                           *
      TIMOTHY J. SILVIA           *   REDACTED TRANSCRIPT
 6                                *
      * * * * * * * * * * * * * *
 7

 8

 9

10        BEFORE THE HONORABLE RICHARD G. STEARNS
              UNITED STATES DISTRICT JUDGE
11                    PLEA HEARING
                   October 21, 2008
12

13    APPEARANCES:

14          UNITED STATES ATTORNEY'S OFFICE, (By AUSA Peter
      Levitt) 1 Courthouse Way, Suite 9000,  Boston,
15    Massachusetts  02210, on behalf of the United States of
      America
16
            LAW OFFICES OF ANTHONY M. CARDINALE, (By Anthony M.
17    Cardinale, Esq.) 665 Summer Street, Boston,
      Massachusetts  02210, on behalf of Defendant
18

19

20
                              Courtroom No. 21
21                            1 Courthouse Way
                              Boston, Massachusetts 02109
22

23            James P. Gibbons, RPR, RMR
                 Official Court Reporter
24            1 Courthouse Way, Suite 7205
              Boston, Massachusetts  02210
25                  jmsgibbons@yahoo.com
```

```
 1                   P R O C E E D I N G S

 2              THE CLERK:  All rise for the Honorable Court.

 3         Court is open.  Please be seated.

 4         This is United States of America versus Timothy

 5    Silvia, Criminal No. 07-10283.

 6         Would counsel please identify themselves for the

 7    record.

 8              MR. LEVITT:  Peter Levitt on behalf of the

 9    government.  Good afternoon, your Honor.

10              MR. CARDINALE:  Good afternoon, your Honor.

11    Anthony Cardinale on behalf of the defendant, Tim Silvia,

12    who is seated to my left.

13              THE COURT:  Mr. Cardinale, I understand from

14    the clerk your client is offering to plead guilty to, as I

15    understand it, one count of conspiracy to distribute an

16    amount in excess of five kilograms of cocaine, not cocaine

17    base but cocaine, and that there is no plea agreement.

18              MR. CARDINALE:  That is correct.

19              THE COURT:  All right.

20              THE CLERK:  Mr. Silvia, would you stand,

21    please.

22         Timothy J. Silvia, Count One of the superseding

23    indictment in Criminal No. 07-10283 charges you with

24    conspiracy to possess with intent to distribute cocaine,

25    from a time unknown to the grand jury, but at least by in or
```

1     about May 2007, and continuing thereafter until in or about

2     July of 2007, at Brockton, Raynham, Middleboro, and

3     elsewhere in the District of Massachusetts, all in violation

4     of Title 21, United States Code, Section 846; to which count

5     you have previously pled "not guilty."

6           Do you now wish to change your plea?

7             THE DEFENDANT:  Yes.

8             THE CLERK:  How do you plead to Count One of

9     the superseding indictment?

10            THE DEFENDANT:  Guilty.

11            THE CLERK:  Would you raise your right hand.

12            **TIMOTHY J. SILVIA, sworn**.

13            THE CLERK:  Would you please take a seat in

14    the witness box.

15          Mr. Cardinale, would you stand beside him.

16            THE COURT:  Mr. Silvia, my name is Richard

17    Stearns.  Obviously, I am a judge of the United States

18    District Court.

19          I am going to ask you some questions.  The reason

20    for the questions is that I have to make my own

21    determination that your decision to plead guilty is a

22    voluntary one, and one made with full knowledge of the

23    consequences of pleading guilty.

24          So if anything I say is confusing or if it appears

25    imprecise, either ask me to rephrase it or feel free to

```
 1     consult with Mr. Cardinale before answering, okay?
 2                   THE DEFENDANT:  Yes.
 3                   THE COURT:  For the record, can you tell me
 4     your full name.
 5                   THE DEFENDANT:  Timothy J. Silvia.
 6                   THE COURT:  How old are you, Mr. Silvia?
 7                   THE DEFENDANT:  Forty-three.
 8                   THE COURT:  Where do you live?
 9                   THE DEFENDANT:  Xxx Xxxxxxxx, Raynham,
10     Massachusetts.
11                   THE COURT:  In Raynham?
12                   THE DEFENDANT:  Yes.
13                   THE COURT:  Were you born in Massachusetts?
14                   THE DEFENDANT:  Yes.
15                   THE COURT:  Where?
16                   THE DEFENDANT:  Taunton.
17                   THE COURT:  Is that where you grew up?
18                   THE DEFENDANT:  Yes.
19                   THE COURT:  You went to school in Taunton?
20                   THE DEFENDANT:  Yes.
21                   THE COURT:  How far did you go in school?
22                   THE DEFENDANT:  Sixth grade.
23                   THE COURT:  Sixth grade.
24                Are you married?
25                   THE DEFENDANT:  No.
```

1            THE COURT:  Have you been married?

2            THE DEFENDANT:  No.

3            THE COURT:  After you left school, what did

4    you do?

5        Did you work or --

6            THE DEFENDANT:  Yeah, I had a job.  I was a

7    mechanic.

8            THE COURT:  Mechanic?

9            THE DEFENDANT:  Yes.

10           THE COURT:  Auto?

11           THE DEFENDANT:  Motorcycle.

12           THE COURT:  Motorcycle?

13       And that was your principal trade?

14           THE DEFENDANT:  Pretty much.

15           THE COURT:  This question is not intended to

16   be intrusive.  It's a question I am required to ask.

17       Have you ever been treated for any mental condition

18   or psychological problem?

19           THE DEFENDANT:  When I was younger.

20           THE COURT:  But nothing that today in any way,

21   you feel, affects your judgment?

22           THE DEFENDANT:  No.

23           THE COURT:  No?

24           THE DEFENDANT:  No.

25           THE COURT:  When you say younger, this was

1    when you were a teenager?

2              THE DEFENDANT:  When I was a kid.

3              THE COURT:  When you were a kid?

4         Do you still have family in Taunton?

5              THE DEFENDANT:  No.

6              THE COURT:  At present are you taking any

7    prescription medication?

8              THE DEFENDANT:  No.

9              THE COURT:  So, as far as you're concerned, as

10   you sit here, your mind is clear, and you comprehend what

11   this proceeding involves?

12             THE DEFENDANT:  Yes, I do.

13             THE COURT:  I know he has, but, for the

14   record, has Mr. Cardinale reviewed the indictment with you

15   and the "elements"; that is, the significant components of

16   the offense charged that the government would have to prove

17   beyond a reasonable doubt if the case proceeded to trial?

18             THE DEFENDANT:  Yes.  He went over all that

19   with me.

20             THE COURT:  Then I'm going to be very brief.

21        Essentially, the indictment, in its superseding

22   form, charges a conspiracy with Todd Donofrio.

23        Did I pronounce it correctly?

24        MR. LEVITT:  Yes.

25             THE COURT:  A conspiracy, under federal law,

1    is an agreement, as would be in this case, between two

2    people to do something that the law forbids.  In this case

3    what the law forbids, obviously, is distributing cocaine,

4    which is a controlled substance.

5         Under the law, the government would be required to

6    prove the existence of an agreement, would have to prove

7    that you were a willing part of the agreement, and that you

8    became part of the conspiracy with the intent and desire to

9    see the conspiracy succeed in whatever its illegal goal was.

10        In this case, as I said, the grand jury alleges

11   that the illegal goal was the distribution of something more

12   than five kilograms of cocaine.

13        So that, essentially, is what the government is

14   required to prove.  That is what the charge is in the case.

15        Do you feel you understand the charge fully?

16             THE DEFENDANT:  Yes.

17             THE COURT:  Let me ask the prosecutor what the

18   maximum statutory penalties are for the offense.

19             MR. LEVITT:  Your Honor, based on the drug

20   weight alleged, over five kilograms of cocaine, with respect

21   to Count One, there's a maximum term of imprisonment of

22   life, and a mandatory minimum term of imprisonment of ten

23   years; a fine of $4 million; a term of supervised release of

24   five years up to life, and a $100 special assessment.

25             THE COURT:  Do you understand those to be the

1   maximum statutory penalties?

2            THE DEFENDANT:  Yes, I understand.

3            THE COURT:  The one that I want to stress is

4   that mandatory minimum sentence.

5        These are sometimes controversial, but Congress

6   has, particularly where drug offenses are involved,

7   authorized a number of mandatory sentences that judges are

8   required to impose.  Whatever the judge might be otherwise

9   inclined to do in the case, when they say "mandatory

10  minimum," it means exactly what it sounds likes; that is,

11  the sentence cannot be imposed below whatever that minimum

12  is.

13       Do counsel anticipate a sentence over and above the

14  mandatory minimum ten years in terms of a recommendation to

15  the Court?

16            MR. LEVITT:  Yes, your Honor.

17       Based on his record, the defendant -- the

18  government believes the defendant is a career offender and

19  will be looking at a Guideline sentence in the range of 262

20  to 327 months.

21            THE COURT:  A career offender under the

22  Guidelines?

23            MR. LEVITT:  Correct.

24            THE COURT:  I think it would be worth it then,

25  Mr. Silvia, if I spent a little bit of time -- because I

PDF created with pdfFactory trial version www.pdffactory.com

know Mr. Cardinale, I'm sure, has spent a lot of time explaining the Guidelines and how they work.

These originated back in the 1980s when Congress became disturbed by what were perceived to be discrepancies in the sentences that federal judges were imposing.

Some judges, in the eyes of Congress, appeared to be very lenient; others appeared to very harsh.  It appeared that defendants who, for all practical purposes, seemed to be similarly situated; for instance, having the same criminal records or the same backgrounds, were getting widely different sentences, depending on what part of the country, whatever the predilection of the judge was with respect to that offense; even, embarrassingly enough, some studies seemed to suggest that things like gender, ethnicity, and race were beginning to enter into, in a broad sense, sentencing in the court system.

Congress wanted to eliminate that, and to do it, they created an agency called the United States Sentencing Commission.  The Sentencing Commission's solution, which Congress adopted, was to drastically reduce the amount of discretion that judges had historically over sentencing matters.  And they did that with a series of directives originally called "Guidelines."  We still call them Guidelines today, although they became less and less guidelines over time, and more and more they became

PDF created with pdfFactory trial version www.pdffactory.com

1      mandatory directives to judges.

2              The Supreme Court was also disturbed by that aspect

3      of what had happened to the Guidelines over time, and three

4      years ago said some very important things about the

5      Guidelines.  One, there's a lot of wisdom distilled in them.

6      The Court certainly didn't reject them.  The Court, in fact,

7      thought the Guidelines were a good place for judges to start

8      the sentencing matters; but, at the same time, the Court

9      said that, Look, a judge is employed basically to use

10     judgment, to use discretion; that, at the end of the day, it

11     is more important that a sentence be just, in the sense that

12     it be proportionate to the crime or the circumstances of the

13     defendant and the interest society had in deterrence and

14     punishment and the defendant's interest in rehabilitation.

15     In other words, a sentence should be tailored to the

16     circumstances of the defendant and the circumstances of the

17     specific crime at issue.

18             So what the Court has told us to do as judges is

19     sit down with these Guidelines and calculate a proper

20     sentence under the Guidelines as to what the Guidelines

21     recommend.  As you've probably seen, there is a table that

22     Mr. Levitt was alluding to that recommends to a judge a

23     sentencing range, expressed as a minimum and maximum number

24     of months.

25             What the Court then says is, You've got to take

1   another step, because having accurately calculated the

2   Guidelines sentence, you have to ask yourself, Is this a

3   reasonable sentence given this case and this defendant?

4         If it is, impose the Guideline sentence; if it's

5   not, use discretion.  Go back to the practice that judges

6   historically exercised and fashion a sentence that is

7   actually commensurate with the case in front of you.

8         It's a practice I follow.  I'm sure it's a practice

9   that -- I don't see other judges, but I'm sure Mr. Cardinale

10   does, but I'm sure you find that most federal judges follow

11   that practice now.

12         So that, essentially, is what will happen.  A

13   presentence report is prepared.  If there are disagreements

14   about the conclusions that the probation officer reaches in

15   preparing the report, we, and I mean you and the government,

16   have an opportunity to put up objections, produce evidence,

17   have a hearing, and ultimately I have to resolve any

18   disagreements that exist and then decide what the correct

19   and appropriate sentence is in the case.

20         So that's the process we will be following.

21         The only thing I would add to that brief

22   description of how sentencing is accomplished in the federal

23   Court is the thought that at the bottom of the process, I

24   have to make the final decision.  As long as I impose a

25   lawful sentence, simple dissatisfaction with the way I

1    exercise the discretion that is now restored to me is not a

2    basis for withdrawing your plea.

3             Do you understand that?

4                 THE DEFENDANT:  Yes.

5                 THE COURT:  Any questions that you have about

6    sentencing or the Sentencing Guidelines?

7                 THE DEFENDANT:  No.

8                 THE COURT:  Mr. Cardinale, do you start from

9    the default position that the government does in terms of

10   what the Guidelines recommendation is?

11                MR. CARDINALE:  Yes, your Honor.

12                THE COURT:  You've explained that thoroughly

13   to Mr. Silvia?

14                MR. CARDINALE:  I have, your Honor.

15                THE COURT:  Mr. Silvia, you do understand that

16   when you plead guilty, you give up your right to have your

17   case tried before a jury?

18                THE DEFENDANT:  Yes, I understand all that.

19                THE COURT:  The prosecutor mentioned a prior

20   criminal record.

21           Have you had any prior experience with a jury?

22   Have you ever sat through a jury trial?

23                THE DEFENDANT:  No.  I never went --

24                THE COURT:  You haven't seen one.

25           Briefly, under our Constitution, judges have a

1    great deal of authority over matters of law, but when it

2    comes to matters of fact -- for instance, is someone guilty

3    or not guilty of a crime -- if either the government or the

4    defendant insists upon it, that decision has to be made by a

5    jury.

6         A jury in federal court is, as it is in state

7    court, is a panel of 12 citizens.  They are chosen from a

8    group randomly selected by computer, as it happens with this

9    court, that live in the eastern part of Massachusetts.  The

10   potential jurors are directed to appear here at the

11   courtroom on the day trial is scheduled to begin.  They are

12   interviewed by the lawyers and by the Court to determine

13   their eligibility to sit on a particular case.

14        In your case, in the process of seating the 12

15   jurors, you and Mr. Cardinale would be permitted to object

16   to any ten you did not want seated without explanation; as

17   the government could object to any six that it did not want

18   seated for whatever reasons the government had.

19        The jury would be instructed forcefully that they

20   would have to ultimately be unanimous as to whether you were

21   guilty or not guilty of this offense.

22        So when I say you give up your right to have your

23   case tried before a jury, I mean not simply the right to

24   have a jury make the ultimate determination as to whether

25   you are guilty or not guilty, but also the right to

1  participate in the selection of the very jury that would

2  make that decision.

3           Do you understand that?

4           THE DEFENDANT:  Yes, I do.

5           THE COURT:  Do you understand you would be

6  entitled to Mr. Cardinale's assistance throughout the jury

7  selection process and throughout the trial of the case?

8           THE DEFENDANT:  Yes, I do.

9           THE COURT:  Do you understand that I would

10 instruct the jury they must presume you innocent unless or

11 until the government succeeded in proving your guilt beyond

12 a reasonable doubt?

13          THE DEFENDANT:  Yes, I do understand that.

14          THE COURT:  Do you understand that the burden

15 of proof in a criminal trial is "proof beyond a reasonable

16 doubt," a very heavy burden that the government carries

17 throughout the trial?

18          THE DEFENDANT:  Yes, I understand that.

19          THE COURT:  Do you understand that, because

20 the burden of proof is on the government, you would have no

21 obligation to prove your innocence, to call any witnesses,

22 to produce any evidence, nor could you be compelled to

23 testify at trial?

24          THE DEFENDANT:  Yes, I understand that.

25          THE COURT:  And you also understand that you

1    give up your right to testify in your own defense, if you

2    should choose to do so?

3                    THE DEFENDANT:  Yes.

4                    THE COURT:  Do you understand that you give up

5    the right to confront the witnesses against you?  That means

6    to have Mr. Cardinale ask questions of the government's

7    witnesses.

8                    THE DEFENDANT:  Yes, I understand that.

9                    THE COURT:  Do you understand that, as we

10   begin the process of a trial, the jury would be told they

11   must presume you innocent?

12                    THE DEFENDANT:  Yes.

13                    THE COURT:  Do you understand that when you

14   plead guilty you give up the privilege against

15   self-incrimination, the right to remain silent, at least for

16   purposes of this proceeding?

17                    THE DEFENDANT:  Yes.

18                    THE COURT:  All right.

19          I'm going to ask the prosecutor to summarize the

20   evidence that would be presented if the case did go forward

21   before a jury.  When he finishes, I have to ask if you agree

22   with the material facts.  By "material facts," I mean those

23   facts that constitute the elements of the offense that's

24   been alleged in the indictment and not the minor details or

25   embroidery, but the essential facts that the government

1    would have to, at a minimum, prove if it was to succeed at

2    trial.

3              All right, Mr. Levitt.

4                   MR. LEVITT:  Your Honor, if the case went to

5    trial, the government would show, among other things, that

6    in 2007 the FBI was involved in an investigation of the

7    Outlaws Motorcycle Club in Taunton, Massachusetts; that, in

8    connection with that investigation, an undercover law

9    enforcement officer had established a relationship with

10   members of the Outlaws in that area, and that the

11   undercover's cover story was that he was a businessman from

12   Texas who came up to Massachusetts periodically.

13             During the course of the investigation, the

14   undercover indicated to members of the Outlaws that he could

15   buy stolen vehicles from them and have them transported down

16   to Mexico in large container trucks, and also that he was

17   involved in transporting large amounts of cocaine and

18   marijuana from Florida, Mexico, up through the United States

19   and into Canada.

20             In 2007, Mr. Silvia was referred to the undercover

21   by an associate of the Taunton chapter of the Outlaws

22   because Mr. Silvia has some vehicles that he wanted to sell

23   to the undercover.

24             On May 23 of 2007, Mr. Silvia met with two

25   undercover agents who were posing as truck drivers and sold

PDF created with pdfFactory trial version www.pdffactory.com

1    them four vehicles for $21,000.

2         In the course of that meeting, which was recorded

3    on audio and videotape, Mr. Silvia asked if they could get

4    him any marijuana and cocaine.

5         They asked him how much cocaine he wanted, and he

6    said that he wanted at least 10 kilograms of cocaine.

7         They discussed a price and agreed that it would be

8    $18,000 per kilogram, and they left the meeting with

9    Mr. Silvia saying that he would talk with his associates and

10   get back to them about the exact amount that he wanted.

11        Over the course of the next two months, June and

12   July of 2007, Mr. Silvia had several recorded telephone

13   conversations and meetings with various undercover agents.

14   During the course of those meetings, they established the

15   parameters for a deal, and in mid July they had a recorded

16   conversation in which they nailed down the terms of the

17   deal; which would be that Mr. Silvia would buy 10 kilograms

18   of cocaine for $18,000 per kilo, that he would bring $50,000

19   in cash to the meeting and take the first five kilograms,

20   and then return in a few hours, after had he had sold the

21   first five kilograms to one or more customers that he had

22   lined up.  He would return with the remaining $130,000 in

23   cash to pick up the remaining five kilograms, and they

24   agreed that Mr. Silvia would leave his gray Hummer and his

25   Harley-Davidson as collateral.

PDF created with pdfFactory trial version www.pdffactory.com

1          I'll note that both of those are noted in the

2    forfeiture allegations in the indictment.

3          On July 30, 2007, one of the UCs had a series of

4    recorded calls with Mr. Silvia in which they arranged to

5    meet.  They arranged to meet that night at the Westgate Mall

6    to make the exchange, the drugs for the money.  Surveillance

7    agents saw Mr. Silvia leave his home in Raynham.  He was

8    driving the gray Hummer and towing a trailer carrying the

9    motorcycle.

10         At the same time they saw a green Crown Victoria

11   registered to Todd Donofrio leave and follow Mr. Silvia to

12   the Westgate Mall.

13         Agents subsequently identified the driver of the

14   Crown Victoria as Mr. Donofrio.

15         They arrived at the Westgate Mall that evening

16   about 7:15.  Mr. Donofrio entered the parking lot first in

17   the green Crown Victoria and did a loop around the lot,

18   which the agents believed was him conducting

19   counter-surveillance, and then Silvia enter the lot and

20   Mr. Donofrio stayed in his car a short distance away while

21   Mr. Silvia got out of the gray Hummer and walked up to two

22   undercover agents who were standing next to their 18-wheeler

23   tractor-trailer.

24         Mr. Silvia referred to the Crown Victoria and said

25   that, He's my partner.  He looks just like me, bald head,

1    big, inside my truck, and he's got some money on him, too.

2    I got 25 in my truck.  He's got 30 on him, and I've got 25

3    right here.

4            Silvia also indicated he had the cocaine sold

5    already and would come back later with the remaining money.

6            Mr. Silvia then handed one of the UCs a bag of

7    cash.

8            Mr. Donofrio then came over, the UC asked him, You

9    have 30?

10           He said, Yeah, and handed him, the UC, a bag of

11   cash and then returned to the Crown Victoria.

12           Subsequently it was determined that there was

13   approximately a total of $55,000 in those two bags of cash.

14           Mr. Silvia then got into the truck with one of the

15   UCs.  The UC retrieved the 10 kilograms of cocaine, and it

16   was actual cocaine that had been seized in connection with

17   another investigation.  The UC gave Mr. Silvia five of the

18   kilograms.  Mr. Silvia asked for a knife to open up one of

19   the kilos.

20           As he was opening up the kilo, the agents moved in

21   and arrested him.  Agents moved in to arrest Mr. Donofrio.

22   He tried to flee.  They had to ram his car to stop him.  He

23   wouldn't get out of his car.  He had tinted windows, and

24   they ultimately had to break the windows to force him out.

25           With respect to Mr. Silvia, that's the evidence

1    that the government would show.

2              THE COURT:  Mr. Silvia, the government --

3    again, I'll try to summarize in a sentence or two -- is

4    alleging that you and Mr. Donofrio agreed to purchase in

5    excess of five kilograms of cocaine from someone who turned

6    out, unbeknownst to you, to be an undercover agent

7    cooperating with the FBI in the process of these

8    negotiations, culminating in the attempted purchase, which,

9    obviously, was frustrated because of the undercover nature

10   of the inducement.

11             Nonetheless, the agreement took you up to the point

12   that the crime had been completed.

13             Do you understand that?  That's what the government

14   alleges.

15             (Whereupon the defendant and his counsel

16   conferred.)

17             MR. CARDINALE:  The best way I can describe my

18   client's concern is that he agrees completely with the

19   factual summary regarding his guilt and does not want to say

20   anything which will in any way affect his co-defendant.  But

21   he agrees that what was said about his actions and

22   culminating in the arrest, he is guilty of those things and

23   understands that that is the factual basis for his

24   conviction.

25             THE COURT:  Let me put it this way, that I

PDF created with pdfFactory trial version www.pdffactory.com

1    think that's perfectly acceptable, but you do agree there

2    was an agreement with another, that it was not you acting

3    alone?

4                    MR. CARDINALE:  The other was the undercover

5    agents.

6                    THE COURT:  Well, I don't think you can

7    conspire with a government --

8                    MR. LEVITT:  You can't conspire with a

9    government agent.  The only "other" here is Mr. Donofrio.

10                   MR. CARDINALE:  He could focus on other

11   individuals, obviously, if he had people he was dealing with

12   if he was going to distribute.

13                   THE COURT:  I am not asking that you implicate

14   Mr. Donofrio.

15                   MR. CARDINALE:  That others were involved.

16                   THE COURT:  The essential part of the crime

17   alleged is that there was agreement with others, not just

18   you acting by yourself.

19                   THE DEFENDANT:  Yes.

20                   THE COURT:  Are you pleading guilty willingly,

21   freely and voluntarily?

22                   THE DEFENDANT:  Yes, sir, I am.

23                   THE COURT:  Has anyone coerced you in a

24   physical sense into pleading guilty?

25                   THE DEFENDANT:  No.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Have any secret promises been made

2     to induce you to plead guilty?

3          THE DEFENDANT:  No secret promise.

4          THE COURT:  Have any threats been made, other

5     than, obviously, the threat of being prosecuted?

6          THE DEFENDANT:  No.

7          THE COURT:  Have you had sufficient time to

8     discuss with Mr. Cardinale the charge in the case, your

9     rights, your possible defenses, and the consequences of

10    pleading guilty?

11         THE DEFENDANT:  Yes, I have.

12         THE COURT:  Do you believe he has acted at all

13    times in your best interest?

14         MR. CARDINALE:  Yes, I have.

15         THE COURT:  Mr. Cardinale, I gather you

16    believe I should accept the plea?

17         MR. CARDINALE:  I do, your Honor.

18         THE COURT:  Mr. Silvia, have I confused you by

19    any question I've asked or anything I've said?

20         THE DEFENDANT:  No.

21         THE COURT:  Am I correct you're pleading

22    guilty because you are guilty and, given what is a pretty

23    massive amount of evidence that the government has, you

24    think it's in your best interest?

25         THE DEFENDANT:  Yes, I'm definitely guilty.

1              THE COURT:  Do counsel have any other areas

2    you would like me to inquire into?

3                   MR. LEVITT:  No, your Honor.

4              THE COURT:  Mr. Cardinale?

5                   MR. CARDINALE:  No, your Honor.

6              THE COURT:  Mr. Silvia, do you mind stepping

7    back to counsel table with Mr. Cardinale.

8         (Pause in proceedings.)

9              THE COURT:  All right.

10        I find Mr. Silvia is well-oriented and that his

11   answers have been responsive to my questions.

12        I find that he understands the nature of the charge

13   and the potential penalties that he faces.

14        I find that he is certainly competent to enter a

15   plea; that he has done so with the full understanding of his

16   rights and the consequences of waiving those rights.

17        I find that there is a sufficient basis in the

18   facts presented by the government to warrant a finding of

19   guilt on this offense beyond a reasonable doubt.  And I

20   understand the reluctance to implicate others by name, but I

21   am satisfied that Mr. Silvia has frankly and fully

22   acknowledged that he is guilty of each of the elements that

23   constitute the offense.

24        In sum, I find that the plea is offered

25   voluntarily, with full knowledge of its consequence and

1    after careful consideration by Mr. Silvia of his own best

2    interest under the circumstances.

3           I will accept the plea and schedule sentencing for

4    Wednesday, February 4, 2009, at 2:30 p.m.

5           All right.  Do counsel have anything else for

6    today?

7                MR. CARDINALE:  Nothing, your Honor.  Thank

8    you.

9                MR. LEVITT:  No, your Honor.  Thank you.

10               THE COURT:  Then we will be in recess on this

11   matter until February 4, 2009.

12               THE CLERK:  All rise.

13          (Proceedings adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1                    C E R T I F I C A T E

2

3

4           I, James P. Gibbons, Official Court Reporter for

5    the United States District Court for the District of

6    Massachusetts, do hereby certify that the foregoing pages

7    are a true and accurate transcription of my shorthand notes

8    taken in the aforementioned matter to the best of my skill

9    and ability.

10

11

12    /s/James P. Gibbons                April 5, 2010

13

     _____

14    James P. Gibbons

15

16

17                JAMES P. GIBBONS, CSR, RPR, RMR
                     Official Court Reporter
18                 1 Courthouse Way, Suite 7205
                   Boston, Massachusetts 02210
19                    jmsgibbons@yahoo.com

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com